WELLS FARGO & CO. v. BENJAMIN. †
(Court of Civil Appeals of Texas. Texarkana. Feb. 11, 1914. Rehearing Denied March 19, 1914.)

1. NEGLIGENCE (§ 136*) — ACTIONS — JURY QUESTION.
In an action against an express company for injuries by a box falling off of an express truck and striking the plaintiff, evidence *held* to make it a jury question whether the truck was negligently handled.
[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 277–353; Dec. Dig. § 136.*]

2. NEGLIGENCE (§ 134*)—ACTIONS—SUFFICIENCY OF EVIDENCE — CONTRIBUTORY NEGLIGENCE.
In an action against an express company for injuries by a box falling off of an express truck and striking plaintiff while he was walking along a station platform, evidence *held* not to raise the issue of contributory negligence.
[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 267–270, 272, 273; Dec. Dig. § 134.*]

3. NEGLIGENCE (§ 122*)—CONTRIBUTORY NEGLIGENCE—PROOF.
Contributory negligence must be proved and cannot be presumed.
[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 221–223, 229–234; Dec. Dig. § 122.*]

4. NEGLIGENCE (§ 136*)—CONTRIBUTORY NEGLIGENCE—JURY QUESTION.
To justify the submission of contributory negligence to the jury, there must be sufficient evidence to support a verdict finding that plaintiff was guilty of contributory negligence as charged.
[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 277–353; Dec. Dig. § 136.*]

5. NEGLIGENCE (§ 122*)—CONTRIBUTORY NEGLIGENCE—PRESUMPTIONS.
In the absence of contrary evidence, it must be assumed that plaintiff conducted himself as a prudent person should have done under the circumstances.
[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 221–223, 229–234; Dec. Dig. § 122.*]

6. NEGLIGENCE (§ 141*)—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE.
In an action against an express company for injuries by being struck by a box falling from a truck while plaintiff was walking along a depot platform, in which defendant alleged contributory negligence in walking or standing near the truck when there was a safe way for plaintiff to use, the court instructed what would constitute contributory negligence, and that it was plaintiff's duty to exercise ordinary care in walking upon the platform to avoid injury, and, if he failed to exercise ordinary care for his own safety "at the time and place and under the circumstances," the jury should find for defendant. *Held*, that the charge on contributory negligence was sufficient, so that it was not prejudicial error to refuse a charge that if plaintiff was walking or standing by the moving truck, and one of ordinary care under the same circumstances would not have done so, the jury should find for defendant.
[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 382–399; Dec. Dig. § 141.*]

7. TRIAL (§ 260*)—INSTRUCTIONS—REQUESTS—MATTERS ALREADY COVERED.
It was not error in a personal injury action, in which the court charged all of the recoverable elements of damages, to refuse a requested charge that, in estimating the injury which plaintiff may have sustained by his diminished capacity to labor and earn money in the future, the jury should consider his age at the time he was injured, which was 56 years, since the jury would naturally take that into consideration without being specially charged to do so.
[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

8. TRIAL (§ 260*)—INSTRUCTIONS—REQUESTS.—PERSONAL INJURIES.
A requested charge, in a personal injury action, not to allow damages for permanent injury unless the jury found that plaintiff was probably permanently injured was properly re-

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes.

† Application for writ of error pending in Supreme Court.

fused, though the charge given did not refer to "permanent" injuries, where it did submit all of the proper elements of damage; it not being proper to charge separately on each element of damage that it must be proven by a preponderance of the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

9. **DAMAGES** (§ 173*) — **EVIDENCE** — **EARNING CAPACITY—REMOTENESS OF TIME.**

In an action for personal injuries to one who was an expert saw filer, it was not error to permit plaintiff to testify, as against an objection of remoteness in time, that for the last 20 or 25 years, "taking it right through," he had earned about $8 a day, since his answer referred to the time he was injured as well as to the years past.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 490–492, 501; Dec. Dig. § 173.*]

10. **WITNESSES** (§ 361*)—**IMPEACHMENT—SUSTAINING REPUTATION.**

In an action for personal injuries, in which plaintiff testified that he was still suffering from defective eyesight, impaired hearing, restlessness at night, general weakness, etc., a physician testified for defendant that he had examined plaintiff and treated him when he was taken to the hospital after the injury, and in his opinion plaintiff had entirely recovered, and another physician testified that he thought plaintiff was entirely well and believed he would improve all right after the litigation was stopped. *Held*, that such evidence contained an implication of fraud by plaintiff in feigning injury and constituted an impeachment of plaintiff's credibility so as to admit evidence of plaintiff's good reputation for truth, etc.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1167–1175; Dec. Dig. § 361.*]

11. **APPEAL AND ERROR** (§ 1170*)—**HARMLESS ERROR—ADMISSION OF EVIDENCE.**

In view of the Court of Civil Appeals rule 62a (149 S. W. x), prohibiting reversals unless the error probably caused the rendition of an improper judgment, any error in admitting evidence as to plaintiff's good reputation for truth, etc., when his reputation had not been impeached, was not reversible.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4032, 4066, 4075, 4098, 4101, 4454, 4540–4545; Dec. Dig. § 1170.*]

12. **WITNESSES** (§ 318*)—**CHARACTER EVIDENCE —ADMISSIBILITY.**

It is error to admit evidence sustaining a witness' reputation, if such witness has not been impeached.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1084–1086; Dec. Dig. § 318.*]

13. **APPEAL AND ERROR** (§ 1031*)—**HARMLESS ERROR—PRESUMPTIONS OF ERROR.**

Courts of Civil Appeals rule 62a (149 S. W. x), prohibiting reversals unless the error complained of amounted to such a denial of appellant's rights as probably caused the rendition of an improper judgment, abolished the presumption that injury results from an erroneous ruling.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4038–4046; Dec. Dig. § 1031.*]

14. **APPEAL AND ERROR** (§ 1028*)—**HARMLESS ERROR—POWER OF COURTS.**

Appellate courts have inherent power to decide that an error was harmless and to refuse to disturb a judgment because of it, when they believe that a proper judgment was rendered.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4034; Dec. Dig. § 1028.*]

Appeal from District Court, Harrison County; H. T. Lyttleton, Judge.

Action by W. S. Benjamin against Wells Fargo & Co. From a judgment for plaintiff, defendant appeals. Affirmed.

Young & Stinchcomb, of Longview, Beard & Davidson, of Marshall, and Baker, Botts, Parker & Garwood, of Houston, for appellant. S. P. Jones, of Marshall, for appellee.

HODGES, J. W. S. Benjamin, the appellee, sued and recovered a judgment against the appellant for the sum of $20,000 for personal injuries received on the 24th of October, 1911. The material facts proved upon the trial are substantially as follows: On the date above mentioned the appellee was stopping at a hotel in the city of Marshall, Tex., and was expecting to leave that place within a short time for some point in California or Mexico. He was a saw filer by trade, and was going to one or the other of those places with the expectation of finding employment. Soon after his arrival in Marshall, he went from his hotel to the ticket office of the Texas & Pacific Railway Company, located at its passenger depot, for the purpose of making some inquiries about rates. Upon arriving at the ticket office, he found it crowded, and concluded to wait till later in the day. He then went to a mail box, posted some letters, and started back to his hotel, walking east along the depot platform. The track of the Texas & Pacific Railway Company at that point runs east and west, and the depot platform was about 36 feet wide and lay on the south side of the railway tracks. South of the platform and near its east end was located the office of the appellant. Next to this office on the west was an unoccupied space, then came the baggageroom and the waiting rooms for white and colored passengers. Next to the platform, and between portions of those two waiting rooms, was the ticket office, and at its northwest corner was located the mail box, where the appellee posted his letters. The doors of these various rooms opened on to the depot platform. The Texas & Pacific passenger train had backed into the station with its rear end pointing east, and about opposite the entrance to the baggageroom. The express car was some distance farther west. As the appellee was walking east along the platform toward his hotel, a truck belonging to the appellant, loaded with boxes and express packages, was being pulled by one of its employés out of the office and west toward the express car. Just as the truck passed the appellee, a box fell off and struck the appellee on the side of the head, knocking him down and rendering him unconscious. Appellee testified that he remembered nothing after posting his letters till he awoke some hours later and found himself in a hospital, to which he had been carried

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes.

immediately after the accident. Most of the witnesses testified that the appellee was between the truck and the railway track at the time he was injured, and some of them say that he fell over on the track. One witness, however, says that appellee was on the south side of the truck, between it and the waiting room. The depot platform was at the time thronged with the usual crowd to be found there at train time.

The petition charged negligence in loading the truck and in the manner in which it was handled at the time. The court submitted negligence in both of these respects as grounds for recovery. The testimony showed that the boxes and packages on the truck after it was loaded extended from six to ten feet above the ground. No question is here made of the sufficiency of the evidence to support a finding that the truck was negligently loaded, but in the first three assignments of error appellant contends that the evidence was not sufficient to warrant the submission of the issue of negligence in the manner of handling the truck.

[1] These assignments are based upon the refusal of the court to give a special charge instructing the jury that there was no evidence that the truck was negligently handled, and upon the action of the court in submitting that issue in the main charge. It was shown that the platform was smooth and in good condition; that on this occasion the truck was handled by one man pulling it along; and that it did not start out of the express office until after the arrival of the train. Some of the witnesses stated that, in going out of the office onto the platform, the truck was pulled north, and then turned west toward the express car; that just as it made the turn the box fell off on the north side and struck the appellee. It is true there is no direct evidence that the truck was being moved rapidly, or that it was jerked in such a manner as to cause the box to fall, but the fact that the box fell just, as the turn was made is a circumstance which should not be ignored. The jury had a right to conclude that with a load of that character—boxes and packages piled high above the bed—being carried through a crowd of people whose attention was diverted by the usual excitement attending the arrival of trains, an additional attendant should have been provided to accompany the truck for the purpose of holding the load in place and preventing any of it from falling off while being thus transported, and to notify people of any danger that might be present. To pile boxes to a height which the evidence shows was done in this instance, and pull them through such an assemblage of people at such a time, without taking such precaution, might well be regarded as the omission of an important duty due to the public on such occasion. The evidence shows that on several other occasions, with similar loads, boxes or packages had fallen from the top of the truck. That was sufficient to put the employés of the appellant upon notice that such an accident might again occur. We think there was sufficient evidence to justify submitting the issues.

The next group of assigned errors complain of the refusal of the court to give special charges on the issue of contributory negligence. The appellant pleaded that the appellee was guilty of contributory negligence in walking or standing near the truck. It also pleaded that there was a safe way for the appellee to use upon that occasion, and that in passing the truck he was guilty of negligence in choosing an unsafe way and in walking or standing by the truck. The first special charge upon this issue to which our attention is called is as follows: "You are instructed that if you find from the evidence that the plaintiff was walking or standing by the moving truck at the time he was struck, and that a person of ordinary care, under the same circumstances, would not have walked or stood by it, you will find for the defendant, regardless of whether or not you find that one or more of the employés of the defendant was guilty of negligence in loading the truck or handling it." Other charges refused present different phases of the same issue. The court gave the following as a part of his general charge on the subject of contributory negligence, to which no objection has been presented: "Contributory negligence, in its legal signification, is such an act or omission on the part of the plaintiff amounting to a want of ordinary care and prudence as concurring or co-operating with some negligence on the part of the defendant as the proximate cause or occasion of the injury complained of." "If you should fail to find that such injury was inflicted upon plaintiff by reason of the negligence of the defendant, it will be your duty to return a verdict for the defendant; or, if you should find that the injury was inflicted on plaintiff by reason of defendant's negligence, and you should further find that the plaintiff himself was guilty of contributory negligence, as that term has been heretofore explained to you, then and in that event it will be your duty to find a verdict for the defendant. It was the duty of the plaintiff to exercise ordinary care in standing or walking upon the platform and the premises at the time and place of the accident to avoid injury to himself, and for his own protection, and, if the plaintiff failed to exercise ordinary care for his own safety at the time and place and under the circumstances of this case, then you will find for the defendant. In this connection, you are further instructed that the plaintiff would not be charged with the duty of anticipating and avoiding any negligence on the part of the defendant, but that it was his duty to so conduct himself and care for himself as to avoid any injury that he may have known, or by the exercise of ordinary care should have

known, to exist by reason of the negligence of the defendant, if any, and also to avoid any injury that might result to him in the ordinary operation of its business." It is contended that this charge was not sufficient; that appellant had the right to have the specific facts relied on as constituting contributory negligence grouped and presented to the jury as expressed in the special charge quoted. In support of this contention we are referred to the M., K. & T. Ry. Co. v. McGlamory, 89 Tex. 639, 35 S. W. 1058, and other well-known cases in which that principle is announced.

[2-4] The important question to be first considered is: Does the evidence adduced upon the trial raise the issue of contributory negligence? Contributory negligence, like any other character of negligence, cannot be presumed; it must be proved. Before the court should submit such an issue, there must be sufficient evidence to support a verdict founded upon a finding that the appellee was guilty of negligence contributing to his own injury in the manner charged. Just what distance Benjamin was from the truck at the time the box fell is not shown, but it is certain that he was standing or walking near enough to be struck by the box as it fell. According to his testimony, he remembers nothing that occurred after posting his letters till he had been removed to a hospital. He is therefore much in the same position with reference to presumptions regarding his conduct immediately before the injury as if he had been killed by the accident.

[5] We must therefore assume, in the absence of evidence to the contrary, that he conducted himself as a prudent person should under the circumstances. Texas & Pacific Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049; I. & G. N. Ry. Co. v. De Bajligethy, 9 Tex. Civ. App. 108, 28 S. W. 829; Riska v. Union Depot Ry. Co., 180 Mo. 168, 79 S. W. 448; Wilson's Heirs v. Railway Co. (Ky.) 86 S. W. 691. In the Shoemaker Case there was a collision between the railway train and two boys, resulting in the death of the latter. It was sought to show negligence on the part of the railway company by circumstances alone; there being no direct evidence of a want of proper care. After quoting some authorities, Justice Williams says: "Our reference to the last case makes it proper for us to say that there is no presumption that the deceased were guilty of contributory negligence, and that the burden of proof was not upon plaintiffs to show that the deceased were not so guilty." In Riska v. Railway Co., cited above, the court used this language in quoting from a previous Missouri decision: "The presumption of due care always obtains in favor of plaintiff in an action to recover damages for an injury sustained by him through the alleged negligence of another." After some other quotations, the court continued: "It was held in Crumpley v. Hannibal & St. J. Ry. Co. [111 Mo. 152], 19 S. W. 820, that one crossing a railroad track at a public crossing will be presumed to have exercised due care and diligence, in the absence of evidence to the contrary, and that such person also has a right to assume that the statutory signals will be given, and to so act." That language was used in discussing the issue of contributory negligence in a case where the injured party had been killed by the collision. In Wilson's Heirs v. Railway Co., also referred to above, the court says: "It is not contended the plaintiff was negligent in any respect, except failing to look for the coming train before going upon the railroad. Whether either she or Henry Conrad did so look could not, for the reason before indicated, be shown by direct testimony. Therefore it was the peculiar province of the jury, not of the court, to determine that question from facts and circumstances proved, for whatever may be the rule elsewhere, it has been definitely settled by this court that it is not to be presumed, in the absence of evidence as to the care exercised by a person injured or killed on a railroad, where he had a right to be, that he recklessly or carelessly imperiled his own life." This rule is evidently based upon the assumption that the natural instinct of self-preservation will cause one to guard his own safety, and that it will be assumed that the usual and ordinary precautions were observed in the absence of opposing facts. We must therefore assume that in approaching the loaded truck Benjamin observed such precautions as a prudent person would have observed under the circumstances, unless other facts lead to a contrary conclusion. These are the facts relied on: One witness testifies that Benjamin was walking along upon the platform, going east, when the box fell off. Another stated that he thought Benjamin had stopped and was standing talking to some one at the time. Benjamin was upon the platform, where he had a right to be, and there is nothing to show that the peril he encountered was indicated by anything except the height to which the packages were piled upon the truck. Let us suppose that the court had submitted special issues of fact, and had propounded to the jury the question: Was Benjamin guilty of negligence contributing to the injury in walking or standing near the truck? Let us assume also that an affirmative answer had been given by the jury to this question. Could it be said that there was any support for such a finding in the evidence referred to? We think not. There is no fact or circumstance shown that is inconsistent with the exercise of proper care on the part of the appellee.

[6] But, if it could be said that the issue of contributory negligence was raised, we think, under the peculiar facts of this case, that defense was sufficiently presented in the general charge of the court. The jury were there told just what it took to constitute con-

tributory negligence. They were further told that it was the duty of the plaintiff to exercise ordinary care, in standing or walking upon the platform at the time and place of the accident, to avoid any injury to himself, and that, if he failed to exercise ordinary care for his own safety at the time and place and under the circumstances, to find for the defendant. The words "time," "place," and "circumstances," under the facts of this case, could be referred to nothing except standing or walking near the truck at the time of the accident. No jury of ordinary intelligence would make any other application of the charge. Hence there is an entire absence of any probability that the appellant was in any way prejudiced by the refusal of the court to give its special charge, even if a charge on contributory negligence was called for.

[7] On the measure of damages the court gave the following charge: "You are instructed that, in estimating the damages, if any, you should consider the time lost, if any, as proximate result of the injury, decreased capacity to earn money in the future, if any, and the mental and physical suffering endured in the past, if any, and the mental and physical suffering that will be endured in the future, if any, but in this connection you are instructed not to consider anything as an element of damages, in making your verdict, which you do not believe from the evidence was the direct and proximate result of the injury received on account of the negligence of the defendant, if any. If you should find for the plaintiff, you will find for him in such sum of money as, if paid now, will fairly compensate him for the injuries he has sustained as the direct and proximate result of said injuries, if any, taking into consideration the time lost, if any, his decreased ability to earn money in the future, if any, the mental and physical suffering he has endured, or may hereafter endure, if any, by reason of said injuries." It is insisted that this charge was incomplete, and appellant presented a special charge in effect telling the jury that, in estimating the injury which the appellee may have sustained by reason of his diminished capacity to labor and earn money in the future, they should take into consideration his age at the time he was injured. The evidence showed that at the time of the injury the appellee was about 56 years of age, and it was agreed by the parties that his life expectancy was 17 years. It was also shown that he was an expert saw filer, and during the last 20 years had been earning from $5 to $8 per day, and in some instances more. According to appellee's own testimony and that of some of his witnesses, he was totally disabled, and there was no probability that he would ever again be able to carry on his trade or calling. In undertaking to estimate the probable loss a person entering upon the decline of life will sustain by loss or impairment of his ability to earn money in the future, the conse-

quences of advancing age should be considered, and a proper allowance made when it is shown that age alone would have diminished the future earning capacity of the injured party. While there might have been no impropriety in giving the requested charge, it would be difficult to say that appellant was prejudiced by its refusal. It requires no expert knowledge of the law to understand that such a fact should be considered. The jurors are familiar with the consequences of advancing age, and in a proper case their practical judgment may be relied on to make a just allowance therefor.

[8] The appellant also requested the court to charge the jury that if they found for the plaintiff not to allow him any damages for permanent injury, unless they found by a preponderance of the evidence that he was probably permanently injured. The terms "permanent injury," or any equivalent expression, were not mentioned in the court's charge. Under the instructions given, the court submitted the proper elements to be considered in estimating the damages to be awarded. There was no reason for selecting that particular element and telling the jury not to allow a recovery for it, unless that character of injury were proven by a preponderance of the evidence. That duty is sufficiently enjoined in the charge given. There would be as much propriety in selecting, one at a time, each of the other elements of damage, and instructing the jury not to allow for any of them unless proven by a preponderance of the evidence, as there would have been in giving this charge.

[9] Over the objection of the appellant, the court admitted testimony to show what the appellee had earned in his calling several years preceding the injury. Bill of exception No. 2 shows that, while the appellee was on the stand, he was asked the following question: "Q. During the time you have been saw filer over ten years with one man, and the remaining time with various other mills, about what were your earnings as a saw filer?" To this he answered: "I have earned about $8 a day for the last 20 or 25 years, taking it right through. First-class saw filers can command from $12 to $15 a day any time at the large mills. At the Brainerd Lumber Company we cut over a million feet a day for 10 years." Bill of exception No. 5 shows that while Geo. A. Cook, a witness for the appellee, was on the stand he was asked this question: "During the time that Mr. Benjamin worked for the Brainerd Lumber Company, in what capacity did he work, and what wages or fees or earnings did he receive for his work?" To this the witness answered: "Mr. Benjamin was employed as gang filer and hand filer, and at times millwright work. His wages varied from $6 to $21 a day." In addition to this Cook testified, without objection, as follows: "He was what was considered a first-class A No. 1 filer. The Brainerd Lumber Company considered him the best.

I did know his habits. He was strictly sober, industrious, healthy. Never knew him to lose a day in that 10 years. His ability was A No. 1. His daily, weekly, and monthly wages varied from time to time, relative to the different parts of the mill he cared for and the different saws he filed. We considered him superior to the average, and as good if not better than the best." On cross-examination the same witness stated: "Mr. Benjamin commenced work for the Brainerd Lumber Company in May, 1895; and the last work that he did for them, as near as I can remember, was August, 1905. * * * Mr. Benjamin had a contract with the company, and had assistants as his work required. Mr. Benjamin paid the helpers out of his contract price. At times we might have paid his helpers, charging the amounts to his account. At times, however, Benjamin had no helpers; at other times one; sometimes two; and occasionally three. When he was working for $6 a day he had no helpers; when working for $10 a day he usually had one helper; when working under contract at $17 a day he usually had two helpers; and when at $21 three helpers." The testimony contained in the bill of exceptions was objected to upon the ground that it was too remote, relating to a time too long prior to the accident, and was therefore not a proper guide for ascertaining what the plaintiff's earning capacity was or would be at the time of the injury. We can see no impropriety in permitting the appellee to state that for the last 20 or 25 years, "taking it right through," he had earned about $8 per day. Whatever may be said of the question propounded to him as an effort to elicit remote facts, his answer stated facts down to the very date of his injury, and in such a manner as to exclude anything objectionable. The purpose in admitting evidence of past employment and earnings in any case is to enable the jury to determine what the future earnings would have been but for the injury. Any past employment, and its compensation, which may fairly and legitimately throw light upon what the probable future earnings would have been, should be admitted for that purpose. There is no fixed rule as to time or subject-matter in such inquiries. Both must be sufficiently related to the probable future employment of the injured party to be reasonably considered as guides. In cases where there has been no change of employment, as is shown in this instance, the remoteness of the transaction offered in evidence should be determined more by the similarity of the conditions than by the lapse of time. Here we have the case of a man having followed the same employment for more than 20 years, and, for aught that appears to the contrary, he expected to continue in it the rest of his life. His earnings were estimated by the day, and during that time appear to have undergone no appreciable changes except such as were attributed to temporary commercial conditions. It doubtless would have been improper to take the employment of the appellee by the Brainerd Lumber Company 10 years before, isolated and alone, as a guide for determining his future earnings. But when that period is referred to merely as a link in a continuous chain of service in the same line of business extending back from the date of the injury, we can see no prejudicial error in getting it before the jury. With the entire business carrer of the appellee before them, the jury, as men of ordinary discretion, would be expected to use common sense in making their estimate for the future.

[10] Over the objection of the appellant, one witness was permitted to testify that the reputation of the appellee for truth and veracity when he lived in and around Brainerd, Minn., was good. The objections urged were that the time was too remote, and that there had been no attack upon the reputation of the appellee. The court approved the bill of exceptions, with the following qualification: "That the defendant, when the objection referred to was made, stated that it had not attacked the general reputation of the plaintiff for truth and veracity, or for honesty and fair dealing; that the plaintiff's attorneys then stated in open court, if the defendant disclaimed having made any attack upon the plaintiff's character and standing with respect to honesty and fair dealing, truth and veracity, that the testimony would not be offered. Then counsel for defendant stated that he would not make that statement, but reiterated his objection to the testimony." It is insisted by counsel for appellee that this testimony was proper because Benjamin's credibility had in fact in a manner been impeached. The record shows that the evidence of the diseased condition, from which the appellee claimed at the time to be suffering, consisted mainly of facts that lay peculiarly within his own knowledge. For instance, he complained of defective eyesight, impaired hearing, a continual roaring in his head, numbness of his limbs, restlessness at nights, dizzy sensations, and general weakness. Drs. Kittrell and Collum, witnesses for the appellant, testified that there were no external evidences of any physical basis for these symptoms; that in their opinion the appellee was suffering from traumatic hysteria; that his troubles were purely imaginary. Dr. McCurdy, a witness for the appellant, testified that he had examined the appellee and treated him when taken to the hospital after the injury; that in his opinion the appellee had entirely recovered. Dr. Moore, another witness for the appellant, testified that he saw the appellee soon after the injury and while in the hospital; that when appellee arrived at the hospital he was mentally confused, but not unconscious; that upon examination witness found an abrasion

on the side of the head about the temple, but no evidence of a fracture. From what the witness knew of the case he thought appellee was entirely well, and if there was no litigation about he would be all right. On redirect examination he stated: "I have seen Benjamin several dozen times since the injury, walking about on the street since leaving the hospital. Q. From what you saw of his condition there, and when he was there, and now, what is your opinion as to whether he would recover after the termination of the litigation? A. I believe he will improve after the litigation is stopped." Neither Dr. McCurdy nor Dr. Moore gave it as their opinion that any hysteria or imaginary trouble existed. The testimony of the last two witnesses not only tended to contradict the facts testified to by Benjamin regarding his condition at the time of the trial, but carried with it the imputation that he was feigning injury for the sole purpose of securing damages. Such an implication of fraud might well be regarded as an impeachment of his credibility. That counsel for appellant expected to profit by such an inference as a legitimate result of such testimony is made evident by their refusal to make the disclaimer upon the conditions referred to in the bill of exceptions. Under the circumstances, we think the sustaining evidence was properly admitted.

[11, 12] But even if it should be held that there was no evidence tending to impeach the appellee, and no legal basis furnished for the introduction of sustaining evidence, we should not feel disposed to reverse this judgment solely upon the ground that the testimony was admitted. Counsel cite a number of cases in which the doctrine is clearly announced that it is error to admit sustaining evidence when the witness in whose favor it is offered has not been impeached. There can be no question that such is and has been the established law. In only two of the cases referred to was the judgment reversed upon that error alone. These are Young v. Sheppard, 40 S. W. 62, and Harris v. State (Cr. App.) 45 S. W. 714. In the first case the suit was for damages resulting from a libelous publication. Before closing his evidence, the plaintiff was permitted to prove that his reputation for honesty, truth, and veracity was good. The court held that under the facts of that case, "the testimony being so nearly balanced, the testimony as to the character of the appellee undoubtedly had its influence upon the jury." In that case injury to the reputation of the plaintiff, the party sustained, was the subject-matter of the suit. It does not appear from the report of the case that he had testified in the case. It is to be inferred from the language used in the opinion that the evidence as to his reputation was offered solely, upon the issue of damages and for the purpose of affecting the amount of the recovery. The second case

was a criminal prosecution, in which the state was permitted to sustain a witness by proof of his general reputation when the witness had not been impeached, but merely contradicted. Judge Hurt, in rendering the opinion, said: "We have held that, where it is shown that a witness has made conflicting statements about a material fact, the party introducing him can support him by proof that his general reputation for truth and veracity is good. We have also held that where there is a conflict in the testimony, and the witness is a stranger, his testimony may be supported in the same way. * * * The testimony being very equally poised, we are of opinion that it was reversible error to permit the state to support John Winkfield, as was done in this case." If this case is to be taken as authority, evidence as to the reputation of Benjamin was admissible upon the ground that he was a stranger in that community. While the proof does not directly show that fact, it is clearly inferable from the whole record. On account of the consequences likely to follow, courts have always been more careful in safeguarding the rights of a defendant in a criminal prosecution than in a civil suit. The quantum of proof required to convict is greater than that which will support a verdict for the plaintiff in a civil action. Both of the above cases are distinguishable from the one here under consideration.

Under the facts, we do not think it probable that the admission of the evidence complained of caused the rendition of an improper judgment. It tended to prove only that the appellee was a truthful person; and, in the absence of some impeaching evidence, that would be presumed. Hence the most that can be said of the evidence is that it was immaterial. Like all other assignments based upon the proof of immaterial facts, the question should be considered with reference to the probable effect of the evidence upon the verdict rendered. It is not contended that the finding of negligence on the part of the appellant's employés, and that the appellee is entitled to some damages, is not supported by the evidence. The testimonial equipoise referred to in the two cases discussed, and which gave rise to the apprehension that an injury resulted from the error in admitting the evidence, does not exist in this case. It occurs to us that if the provisions of rule .62a (149 S. W. x) mean anything, and are to have any practical application in the determination of questions on appeal, this is a case in which they may properly find a place. An elaborate written argument has been presented in which are cited numerous decisions holding in effect that when an error has been committed in the course of the trial, either in the admission or exclusion of evidence, or in giving instructions to the jury, injury will be presumed unless the contrary clearly appears. That this has heretofore been the rule in this state is not denied.

[13] But we take it that the promulgation of rule 62a is the positive announcement by our Supreme Court of a change of judicial policy in respect to such matters; that the presumption in favor of injury, if not shifted, is abolished; that hereafter no case should be reversed because of errors in such rulings unless it should be made to appear "that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment." It is insisted that, if such be the construction that should be placed upon this rule, then the Supreme Court transcended its powers in attempting to regulate appellate procedure. We know of no statutory or constitutional provision which conflicts with this rule, or denies to the Supreme Court the power to make it. But it is not necessary to hold that the authority for promulgating such a rule is within the rule-making power conferred upon the Supreme Court, in order to justify the adoption of the judicial policy therein announced.

[14] The power to hold an error harmless and to refuse to disturb a judgment, when in their opinion the proper one has been rendered, belongs inherently to appellate courts. What such courts may do without a rule is not put beyond their reach because it happens to be referred to an unauthorized rule. Speaking for ourselves alone, we feel it our duty to follow the established policy of our court of last resort in such matters, whether that policy is expressed in rules of procedure, or in precedents to be found in decided cases.

The last error assigned complains that the verdict is excessive. The testimony shows that the appellee was 56 years of age at the time of his injury, and that his life expectancy was 17 years. It is argued that the amount allowed is double what would be necessary to compensate him for what he would have earned within 17 years, had he lived so long. The jury had a right to conclude from the testimony that the appellee's injuries were permanent; that he would never be able to perform any more labor; that he would continue to suffer from the same condition which he described as existing at the time of the trial. To this might be added the probable expense of employing physicians and nurses to treat and care for him in a helpless condition. The record before us indicates that much testimony was taken upon the trial, and that the inquiry into his condition was thorough and searching. The jury had the opportunity to see the appellee and to observe his appearance. How much they allowed for the physical suffering he endured, or the metal anguish resulting from the wreck of his manhood, we have no means of knowing. Compensation for the loss of future earnings is far from being all that should be taken into account in passing on the question of excessive verdict. That ele-

ment of damage may sometimes be a comparatively small portion of what the injured party is justly entitled to receive. We cannot say that the verdict is excessive.

The judgment is affirmed.