LANCASTER et al. v. FITCH. (No. 2497.)*

(Court of Civil Appeals of Texas. Texarkana. Feb. 9, 1922. On Appellants' Motion for Rehearing, March 2, 1922. On Appellee's Motion for Rehearing, March 23, 1922.)

**1. Master and servant ⬮286(33)—Negligence as to brakeman uncoupling cars held for jury.**

In action under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to brakeman crushed between cars while attempting.to uncouple them, the question of whether the railroad was negligent in causing the train to move without notice *held* for the jury.

**2. Master and servant ⬮286(14)—Negligence in permitting spike to protrude from tie held for jury.**

In action under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to brakeman crushed between cars after his foot had been caught by a spike extending above the tie, the question of the railroad's negligence in permitting spikes to extend above the tie *held* for the jury.

**3. Master and servant ⬮288(5)—Assumption of risk of railroad's negligence in permitting spike to protrude above top of tie held for jury.**

Brakeman whose leg was crushed when foot caught on spike protruding above tie, when between cars for purpose of making a coupling, did not, as a matter of law, assume the risk incident to protruding spike where question of whether railroad was negligent in permitting spike to protrude above top of tie was for the jury.

**4. Master and servant ⬮129(6)—Defective angle cock held not alone the proximate cause of injury to brakeman.**

Where brakeman's leg was crushed when foot caught in spike protruding above top of tie trying to turn defective angle cock, when other employees caused train to move while brakeman was between cars, the condition of the angle cock was not the proximate cause of the injury, but was a contributing cause, in connection with negligence in moving train, and in permitting spike to protrude above tie.

**5. Trial ⬮296(3)—Submission of charge of negligence not constituting the proximate cause of the injury held not reversible error in view of other instructions.**

In action for injuries to brakeman's leg, crushed when foot caught in spike protruding above top of tie in turning defective angle cock, when other employees caused train to move, the submission of the defective condition of the angle cock as a separate ground of negligence, though it was not in itself the proximate cause of the injury, *held* not ground for reversal, in view of other instructions submitting questions

---

⬮For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted May 17, 1922.

of negligence in moving train and in permitting spikes to protrude above top of tie, and whether the combined negligence was the proximate cause of the injury.

Appeal from District Court, Harrison County; P. O. Beard, Judge.

Action by Ben E. Fitch against J. L. Lancaster and others, receivers. Judgment for plaintiff, and defendants appeal. Affirmed.

The action was brought by the appellee to recover damages for the loss of his right leg, which was crushed by the movement of the train while he, in the discharge of his duties as rear brakeman on a freight train, was between two cars, attempting to uncouple them, in the yards at Cut Off Junction, La. The petition alleges the three grounds of negligence:

(1) In having "permitted the spikes in the cross-ties of the track to stick up or protrude above the surface of the ties, and permitted the cross-ties to remain so close together and to protrude above the surface of the track in such a manner that the same would be dangerous to the plaintiff and others in similar employment engaged in the performance of their duties at said place;" (2) "because of the negligence of the defendants' servants engaged in operating and directing the movement of said train, in that, after the train had stopped, and after the plaintiff had gone between the cars, as was required of him in performing his work, for the purpose of turning the angle cocks on the air brakes and uncoupling the same, and while they knew, or in the exercise of ordinary care would have known, that the plaintiff was between the cars, and would be endangered by moving the train, the said servants, without giving any signal or notice to the plaintiff of their intention so to do, carelessly and negligently moved or caused the train to be moved so as to run over the plaintiff's leg while the plaintiff was between the cars endeavoring to turn the angle cocks on the air brakes;" and (3) "that the angle cocks on the car had become worn, rusty, or out of repair, and were in such a defective condition that the same could not be turned or operated as was required in the ordinary or usual manner and without danger to the plaintiff, and that same were defective so that they could not be operated or turned in the ordinary and usual way, and that plaintiff, while attempting to turn or operate the same, and by reason of the defect therein, was compelled to use a great deal of force and strength in trying to turn or operate the same, and that, while the plaintiff was exercising his strength and force in an effort to turn or operate the same, and by reason of his being required to use considerable strength and force in turning and operating the same, his foot was caused to slip or slide under the wheel of the car or in front of the car, and that said car moved or rolled upon and over his leg; that the defective condition of the angle cocks was unknown to the plaintiff, but was known to the defendants, or could have been known to them by the exercise of ordinary care; and that such negligence was the proximate cause of the injuries to the plaintiff."

The defendants answered specially denying each ground of negligence alleged, and averring that the plaintiff's injuries resulted from his own careless and negligent acts; that plaintiff gave the back-up signal to take up the slack in the train, which caused the wheels of the car to pass over his leg, and that he slipped and fell at the time the train moved in response to his signals to back up.

The case was tried before a jury, and in accordance with their verdict a judgment was entered in favor of the plaintiff.

It is admitted that the plaintiff at the time of his injury was engaged in interstate commerce, and that the case is controlled by the Employers' Liability Act of Congress (U. S. Comp. St. §§ 8657–8665).

It was shown on the trial that the train in question was a regular freight train, made up and beginning its journey at Boyce, La., and to end the trip, as usual, at Marshall, Tex. The train started on its trip with between 60 and 70 cars containing interstate commerce. At Lucas, La., a station en route, certain cars were set out of the train, leaving 45 cars to continue on the journey. Further en route, at Cut Off Junction, in Louisiana, there were 14 cars, located in the middle section of the train, to be set out of the train and placed on a side track for delivery to connecting carriers for transportation to their destination. The employees on the train each knew that these cars were to be uncoupled from the train and switched to the side track at this station. It was shown that the train, headed west, arrived at Cut Off Junction at 9:20 p. m., and that the night was dark, though clear of rain. It had rained shortly before that hour, leaving the ground, according to plaintiff's testimony, "damp," and, according to that of the fireman, "wet and slick." The roadbed at the place the train stopped was level. Plaintiff's duty as rear brakeman was to couple and uncouple the cars, and it was his duty to uncouple the cars in which he was engaged in uncoupling when injured. The plaintiff's testimony is uncontradicted that, in uncoupling cars—

"we operate entirely by signals. It is the duty of the trainmen, with reference to moving a train after a stop signal is given, to watch me give another signal before they give a signal to move or move the train. They should wait for me to give a signal, after the train is stopped, before moving the train. The man that goes in between the cars is the only one to know (when to move), and he gives the signal to move, and no one else is permitted or supposed to give the signal besides the man in between the cars."

As the train approached Cut Off Junction, going at the time at the rate of speed of six miles an hour, the plaintiff got out of the caboose, and, going over the top of the cars

to about the middle section of the train, then gave a stop signal with his lantern, and the train came to a final stop in response to the signal. The head brakeman got off the engine, and, he says, stood "14 car lengths from him (plaintiff), looking towards him (plaintiff), waiting for a signal." When "the train had come," as plaintiff testified, "to a full stop" and "a complete stop," the plaintiff went in between two cars to make the uncoupling. In making the uncoupling in the usual and ordinary manner it was necessary to step in between the cars, and first to turn the angle cocks, which are a part of the air brake system of the train, on both box cars, and then to uncouple the air brake hose which connects the air brake system from car to car, and which is coupled together about the center between the two cars. The plaintiff turned the angle cock on one of the cars, and, he says, turned it easily." That angle cock was on the car on the plaintiff's "right-hand side," or west, towards the engine, as the plaintiff was standing "on the south side of the train at that point," and "facing north." The plaintiff "then stepped clear of the track and tried to turn the angle cock on the other car on the south side, or left-hand side." He further testified:

"And I did not turn it the first time. The reason I did not turn it, it was rusty, and something was wrong with it, and it would not turn. I made an attempt to turn it, and it did not turn. Then I placed my right foot over in the track to brace myself to turn it, and then I attempted to turn it, and it did not turn. I then made another effort to turn it, and just as I went to turn it my foot slipped, or caught on something, and the train moved and ran over my right leg. That happened while I was pulling at the angle cock attempting to turn it. It ran over my leg as it moved west."

The car on which the angle cock was hard to turn was, it appears, "a Pennsylvania car, 43058, loaded with merchandise for Longview, Tex.," and it does not appear whether the car was or was not a foreign car except by its name, and it does not appear how long the car had been in the possession and control of the defendants, except that "the train was made up at Boyce by the switchmen there." It was proven "that the railway company has car inspectors employed for the business of determining whether or not these angle cocks are in good shape. An angle cock out of repair or rusty can be discovered by ordinary inspection." The plaintiff testified:

"Just as I went to turn it (the angle cock) my foot slipped or caught on something, and then the train moved and ran over my right leg."

And the evidence shows that, according to the fireman:

"After Fitch (the plaintiff) was injured I made an examination of the track and looked it over. The spike heads were protruding on the inside of the rails, and the track was shovelled out, I suppose for drainage, having the ends of the ties on the outside of the rail, I suppose, 3½ or 4 inches above the ground. The spikes there were regular railway spikes. There were several ties with spike heads protruding inside the rails from ½ inch to 1½ inches. There was one spike driven in a tie which was located 14 or 15 inches inside the rail. It was protruding from the tie about two inches. That was at the place or near the place I found Mr. Fitch. I found Mr. Fitch's shoe there on the ground. I picked it up and put it in the caboose. The shoe here exhibited to me is the shoe I found there. It was torn on the inside just like it is now. There are no wheel marks on it, and it appears not to have been run over by the wheels of the car."

The roadmaster testified:

"The next day after he was injured I made an examination of the track where he was injured the night before. I found a spike in a tie about 12 inches from the rail sticking up about 2 or 2½ inches. * * * Spikes should not be left in the track in that manner; a man could hang his foot under there and trip him."

The plaintiff testified:

"I could not myself say what my foot got caught on. I didn't make an examination of the track there. After I got hurt I paid no further attention to it. I had on a pair of shoes. The shoe was torn off my foot. I had a new pair of strings in it, and both strings were broken, and the shoe was bursted clear off of my foot. The wheels did not pass over my shoe. This is my shoe you exhibit to me. The shoe shows indications of having caught on something just about the heel there on the inside of the left-hand side of the shoe. * * * In pulling at the angle cock my foot either slipped and caught under something or a cinder rolled under my foot. I did not fall down until after I felt the weight of the wheel, it knocked me down then."

In a written statement to the claim agent, made by the plaintiff shortly after the injury, appears the following:

"I do not know whether my foot caught on a spike or on something that caused the wheel to catch it, or whether I slipped, as my foot was caught by the wheel before I really knew. I jerked my leg from under the wheel after it passed over it."

The evidence is conclusive that the train "moved" and that the front wheel of the car, headed east, which was on the plaintiff's right-hand side, in a movement west ran over and crushed his right leg. The contention respecting "the movement" of the train was, (1) on the plaintiff's part, that the train was moved by the engineer without any signal from him to do so, and, (2) on the part of the defendants, that the engine did not move until Brakeman Whit-

ley received a signal from the plaintiff to have the train backed, which signal was given by the plaintiff after he received his injury, and whatever movement the train made after the plaintiff went between the cars was caused by the train settling down or the slack running out of the rear end of the train. The evidence shows that the train came to a stop in response to the signal to do so. When the stop was made then the plaintiff proceeded between the cars. The plaintiff's evidence was that at the time he went in between the cars "the train had come to a complete stop;" "a full stop." He says:

"Ordinarily you just stop the engine and the train stops with it and the cars usually take the slack up when the engine stops, but if there is automatic air it don't. Yes; when a train was running slow like this one I suppose it was necessary to put the automatic air on to stop it. No slack runs out of the train if the automatic air is set—that is, if all the brakes are working. I know the kind of brake used on the occasion I was hurt. It was automatic air brakes. Automatic air was placed on them. The engineer applied the automatic air and stopped the train. Then I went down on the side of the box car to uncouple the cars. The automatic air takes effect on each car up and down the train—puts the brakes on each individual car up and down the train. When the automatic air is applied no slack runs out, for the reason that each car is braked by virtue of that automatic air. I don't know what happened when the train moved. When the automatic air is applied that holds the whole train standing. If the air on one car is cut out, and not the car ahead of it, the air would not take effect on that car and prevent it rolling probably two or three inches, but not any longer distance, owing to compression of springs and the drawhead."

A part of the written statement of the plaintiff to the claim agent reads as follows:

"As I was in the act of turning it (the angle cock) the slack ran up from the east end of the train, from toward the caboose, and my right foot and leg was caught by the wheel of the car to the east of me, passing over my right leg. I cut out the air on some of the cars before we reached Cut Off Junction, on account of the air sticking on them, and I think this possibly had something to do with the slack running up from that end of the train when I was injured."

Plaintiff on the trial testified:

"I made the statement you have. To the best of my knowledge at that time I attempted to make a correct statement. I don't think it is a true statement now. When I made that statement at the time I did not remember about him (the engineer) putting on the automatic air brakes; I was suffering so much (from leg). I changed my mind about it as soon as I remembered that he (the engineer) did put on the automatic brake, as I knew then that there could not be any slack. And I did not at the time of the statement know as a fact

whether or not it was the engineer that had moved up the train."

Continuing, the plaintiff testified:

"When I went in between the cars on this occasion the train had come to a complete stop. No one else is permitted to give the signal when the train is to move besides the man in between the cars. * * * I don't know what happened when the train moved. I did not give any signal at all for them to move that train after I had given the stop signal. I did not give anybody a signal to move there at all, not until I was hurt. I gave a signal after I was hurt for them to come to me. Of course it (the movement of the train) knocked me down, and knocked my lantern out. I had the lantern in my hand, and it was knocked out of my hand. I hollered for help as soon as I felt I was run over. I crawled around and found my lantern and lit it and tried to get some of them to help me. After I was hurt the signal I gave was to try to get Whitley to come to me, and was meant for Whitley to come to me. The signal I gave was like this (indicating), which means, Back up."

The fireman of the train testified:

"When we came to Cut Off Junction we had some cars to set out there, and we made a stop to set these cars. After the train stopped it then moved again. I was given a signal by Brakeman Whitley to give slack. This was about 30 or 40 seconds after the train had stopped. When I got that signal from Whitley I passed it to the engineer and he tried to move backwards, but it seems the train was stopped in a bunch. The slack was so bunched that the train had to move forward, and the engineer released the brakes and moved four or five feet in a forward motion, and then backed. When a train is bunched up there could be no such thing as slack running out of the train. To be bunched up means that the cars were all pushed up together against the engine. After that movement was made I got another signal. That is what is known as a washout signal, and is a violent signal meaning to stop at once and stand where you are. Brakeman Whitley gave that signal, and after that signal we stood there, and in about, I suppose, one-half minute or a minute, Whitley came running towards the engine, and said, 'We have cut Ben's leg off.' * * * I gave the engineer the first stop signal when I received it, and he stopped. He did not move his train until he got the slack signal from me. The train stopped perfectly still during that time. There was not a movement of the train until I got the slack signal, and then the train moved. I did not move again until after the washout signal."

The testimony of Brakeman Whitley is as follows:

"We pulled into Cut Off Junction with about 45 cars. I was on the engine, and I jumped off and was watching Brakeman Fitch, who was on top of the train about 31 cars from the engine. I could see him climb down the side of a car on the south side, and as he climbed down he gave me a signal to stop. I then turned my back, facing the engine, and gave the fireman the signal to stop, and the train came to a stop.

I stood there a minute or so looking towards him, waiting for a signal, and then he gave me a little signal to back up, like he wanted slack, and I passed that to the fireman, and he flagged me down again and I passed that signal, and the engineer stopped the train. I hear (him) call, 'Oh, Whit, come here,' and I ran down there, and he said, 'Oh, boy, I got my leg cut off; do something for me quick.' I asked him how he got hurt, and he said, 'I slipped and fell.' "

The engineer testified:

"The train nor the engine was not moved after I stopped it until I got the slack signal. My engine was standing still from the time I got the signal to stop until I got the slack signal. The cars were bunched against the train. I reversed the engine and couldn't give the slack. I mean that the cars were all pushed down against the engine against one another; they were tight together—that is, the drawheads were all run together. When cars are bunched against the engine there is no slack in the train to run out; all the slack is against the engine. When the train is in that condition you have to move your train forward, and then reverse to give any slack or get any slack."

In view of the evidence, it is concluded (1) that in point of fact the angle cock in question was in faulty condition, and difficult of movement in turning it, and it does not appear that defendants did not have reasonable opportunity to inspect and remedy it before being put in the train, and that such faulty condition could have been discovered by reasonable care; but, in point of fact, it is concluded such negligence of itself was not the proximate cause of the plaintiff's injury, and (2) that having the protruding spike in the tie near the rail, said spike catching the plaintiff's shoe so that he could not remove his leg in time to avoid the car wheel running over it, was negligence on the part of the defendants proximately causing the injury, and (3) that, in deference to the verdict of the jury, there being evidence to support it, the defendants were, in point of fact, guilty of negligence in moving the train without signal from the plaintiff while he was between the cars, and that such negligence was the proximate cause of the injury, or (4) that the negligence of having a protruding spike and of the movement of the train combined together was the proximate cause of the injury. The verdict as to amount of damages is sustained by the evidence.

Prendergast & Prendergast and Hall, Brown & Hall, all of Marshall, and R. S. Shapard, of Dallas, for appellants.

Bibb & Caven, of Marshall, for appellee.

LEVY, J. (after stating the facts as above). The appellant predicates error in submitting as an issuable fact to the jury the two alleged grounds of negligence (1) in causing the train to move upon the appellee after he went in between the cars to make the uncoupling, and (2) in leaving and permitting to remain spikes extending above the tie near the rail. The points relied on for the error are:

"That after the train stopped for Fitch to uncouple the cars the engine did not move until Brakeman Whitley received a signal from Fitch to have the train backed, which signal was given by Fitch after he received his injury, and whatever movement the train made after Fitch went in between the cars was caused by the train settling down or the slack running out of the rear end of the train."

Further:

"The fact that spikes protruded above the top of the ties in the track was a condition in which the track everywhere was frequently found and did not constitute negligence in this particular case, and the plaintiff assumed that risk. The evidence did not show that any spike caused the plaintiff to fall and receive his injury."

[1] The facts and circumstances in evidence were quite sufficient, it is concluded, to make a question for the jury alone to determine as to whether or not the employees in charge of the train caused to be moved and did move the same after the appellee went in between the cars for the purpose of making the uncoupling, without any signal from or notice to him. The evidence conclusively shows that the train came to a stop at Cut Off Junction for the purpose of taking 14 cars out of the train, to be left on a side track for delivery to a connecting carrier for further transportation. The train was stopped at the particular place on the track in response to a signal from the appellee, whose duty it was to give the signal. And the evidence is undisputed that when the train stopped the appellee went in between the cars to make the uncoupling. The operatives of the train each knew the cars were to be uncoupled and switched, and that appellee was to do the uncoupling. And it is further established as a conclusive fact that the appellee's right leg was run over by a wheel of the car after he went in between the cars to make the uncoupling. The fact that the leg was run over and mashed by a wheel of the car can be taken as a physical fact demonstrating beyond all doubt that the train moved while the appellee was between the cars making the uncoupling in the way required to be done. And the car that "in moving west" ran over the leg was the thirtieth car in the train from the engine, headed west, and the fourteenth car from the caboose on the east. At the time the appellee went in between the cars the train, he testifies, "had come to a complete stop," "a full stop." What caused the train or the car to move "west" so as to injure the leg? Looking to the record in that respect it is seen that there is evidence that, when the train, going about six miles an hour, was stopped in the first instance at

Cut Off Junction, "the engineer applied the automatic air and stopped the train; automatic air was placed on them." And there is evidence on the part of the engineer showing:

"The train nor the engine was not moved after I stopped it until I got the slack signal. My engine was standing still from the time I got the first stop signal until I got the signal to give slack; the cars were bunched against the train. When the cars are bunched against the engine there is no slack in the train to run out. When the train is in that condition you have to move the train forward and then reverse it to give any slack or get any slack."

And the testimony of the fireman was to the same effect as the evidence given by the engineer. And the plaintiff testified:

"Ordinarily if you just stop the engine the train stops with it, and the cars then usually take the slack up when the engine stops, but if there is automatic air it doesn't. I know the kind of brakes used on the occasion I was hurt. It was automatic air brakes, and automatic air was placed on them. The automatic air takes effect on each car up and down the train and puts the brakes on each car in the train. When the automatic air is applied no slack runs out for the reason that each car is braked by virtue of the automatic air."

And the plaintiff further testified that, after "the engineer applied the automatic air and stopped the train," "then I went down on the side of the box car to uncouple the cars." If, then, according to this evidence, the air brakes were set on the train, and the train was at "a complete stop," and when the automatic brakes are set "there is no slack in the train to run out," and "no slack runs out," the jury would be authorized to find as a fact that "the movement" of the train was not caused by the settling down or the slack running out of the train. And if the appellee did not, as he testifies, go in between the cars until after "the engineer applied the automatic air and stopped the train," and "the train had come to a complete stop," then the jury could find as a fact that, if there had been a settling down of the train after it stopped, it occurred before the appellee went in between the cars, and therefore was not the movement of the car that caused his injury. And neither can it be said that the evidence conclusively shows that, after the appellee went in between the cars, his turning the angle cock on the east car so released the air on that car as to cause it to move and run over his foot. And the evidence further shows that, even if the car had moved by reason of the release of the air in turning the angle cock on that car, it could only have moved "two or three inches forward," which would not have been far enough to have caught and run over the plaintiff's leg, which was at the time "over 15 inches" distant. The undisputed evidence is that the car came "for-

ward" to "the west" far enough not only to reach the appellee's leg, but with force enough to knock him down and to knock his lantern out. And neither can it be conclusively said, we believe, that the car "moved west" and ran over the leg, because whatever movement that car made was solely due to the slack running out of the cars to the rear end of it. It does appear in the appellee's statement to the company, offered in evidence, made shortly after the injury, that "I cut out the air on some of the cars before we reached Cut Off Junction, on account of the air sticking to them." These several cars on which the air had been cut out were located, it would seem, between the caboose and the car that injured appellee. It may be that this condition of the rear 14 cars may have caused movement of the car "west" by reason of slack from the cars behind running up against it, even though, and notwithstanding, the 30 cars ahead of it bunched against the engine did not move from any slack movement. But there is no affirmative or conclusive evidence that there was such slack movement, and the inferences from all the facts and circumstances were for the jury. It is not disputed in the evidence that the engineer moved the train forward "west" four or five feet in response to the slack signal from Head Brakeman Whitley. Whitley testified that the appellee gave him this signal, but appellee denies that he did so. Appellee claims that he gave Whitley the original stop signal, and a violent signal "after I was hurt." Mr. Whitley accounts for the stop signal and the last violent signal to stop, but asserts that the "slack signal" was also given him by appellee before the last violent signal was given. This conflict was for the jury. If Whitley gave an unauthorized signal to the engineer to move the train, it was for the jury to say whether or not he did so, and whether or not there is in all the evidence negligence on Whitley's part.

[2, 3] The next proposition should be, we think, overruled. There is ample evidence for the jury to determine, as in their province, that the protruding spike in the tie was extremely dangerous, and that the spike caught and held the shoe, and in consequence appellee could not remove his foot in time to avoid its being run over by the moving car, and that there was negligence in having the spikes protruding above the top of the ties. Ry. Co. v. Cleland, 50 Tex. Civ. App. 499, 110 S. W. 122; Ry. Co. v. Geron (Tex. Civ. App.) 162 S. W. 471; Ry. Co. v. Ford, 56 Tex. Civ. App. 521, 121 S. W. 709. If the act of having the protruding spike in the tie at the place it was is an act from which a jury is authorized to infer negligence, then the appellee did not assume the risk of such special and, as it appears, unforeseen negligence on the part of the appellant. And if the fact that spikes protruded above the ties

was an act of negligence (which the jury had the right to determine), then it could not be said that appellee was precluded of recovery, as a matter of law, upon the doctrine of assumed or accepted risk. Therefore assignments of error numbered 3, 4, 7, 10, 11, 19, 20, 21, 22, 23, and 26 should be overruled.

The court submitted separately the three grounds of alleged negligence, and further charged:

"Again, if the jury shall find from a preponderance of the evidence that the angle cock was defective and out of repair. on account of the negligence of the servants of the defendants, and that spikes were permitted to protrude above the cross-ties on account of the negligence of the servants of defendants; and shall further believe that, while the plaintiff was making an effort to turn said angle cock, his shoe caught on. a protruding spike, and that the combined negligence, if any, on the part of the defendant in permitting the angle cock to become defective and out of repair and in permitting the spike to protrude above the cross-tie was the proximate cause of plaintiff's injury, then you will find for him, unless you find for the defendant under other instructions given you."

The appellants excepted to the charge, and submit as grounds of error the propositions:

"The condition of the angle cock was not the proximate cause of the injury."

"After the court had charged the jury that plaintiff might recover on the train moving without a signal from him, and that he might recover on the ground of the angle cock being defective, then the court erred in telling the jury if they believed the result of the combined defects in the angle cock and spikes was the cause of the injury that the plaintiff could recover. The plaintiff did not plead the combined action had caused his injury, and because from the nature of the evidence the two conditions could not have co-operated in causing the injury, and there is no evidence that they did co-operate."

[4, 5] The condition of the angle cock was, in the evidence, an act of negligence; but such negligence was not, we conclude, in itself alone the proximate cause of the injury. But the question of "proximate cause" as submitted by the court's charge was properly submitted to the jury for decision, we think, when, as here, the injury could correctly be said to be the result of concurring causes. The combined action of the defective angle cock and the protruding spike in the tie and the movement of the train could have co-operated in causing the injury. For it appears that, on account of the rusty and defective condition of the angle cock, and the extra force required to turn it, the appellee had to place his right foot forward on the tie to brace himself to apply the force required to turn the angle cock. And while appellee was pulling on the angle cock the shoe on the foot hung in a protruding spike, and the moving train caught and ran over his leg. The great strength and force required to turn the angle cock caused the shoe on the foot to hang on a spike, so that appellee could not remove his leg in time to avoid its being run over by the car wheel. In another portion of the charge the court had submitted to the jury an approved definition of the term "proximate cause." And therefore there was not, we think, error in giving the last instruction above. And the fact that the negligent condition of the angle cock was not of itself and by itself alone the real producing or proximate cause of the leg's being run over does not, we think, require a reversal of the judgment, in view of rule 62a and its repeated construction, because the evidence did not authorize its submission to the jury in that form as an issue. If the evidence conclusively showed that the angle cock and its condition did not of and by itself alone cause appellee the injury to the leg, then clearly a jury of ordinarily sensible men would not find to the contrary, and the court could not reasonably say that they did so find and found their verdict thereon. And we think that the error complained of did not cause injury or the rendition of an improper judgment. Rule 62a; Ry. Co. v. Shinn (Tex. Civ. App.) 153 S. W. 636; Ry. Co. v. Corley (Tex. Civ. App.) 154 S. W. 621; Wells Fargo & Co. v. Benjamin (Tex. Civ. App.) 165 S. W. 120. The case of Tisdale v. Ry. Co. (Tex. Com. App.) 228 S. W. 133, is relied upon as requiring a reversal of this judgment. It is believed that case is not applicable to the very question here made, and further it is believed that the approval of the Supreme Court was not intended to extend to lay down a general rule applicable to every case that it is an error per se requiring reversal of the judgment in submitting to the jury, as done in the instant case, an alleged act of negligence proximately causing the injury, when the evidence in the particular case shows the act to be negligence, but further conclusively shows that such act of negligence was not of and by itself the proximate cause of the injury.

We have considered the assignments pertaining to the special charges, and think there is no error. The court's main charge covered all the issues in the case, and favorably authorized a verdict for appellant upon all issues.

The judgment is affirmed.

## On Appellants' Motion for Rehearing.

We still think that the angle cock and its condition was not of and by itself alone the proximate cause of the appellee's injury, and that appellee could not legally predicate a recovery on that ground alone. The error, though, we formerly concluded should not operate to reverse the judgment, in view of rule 62a (149 S. W. x). In point of principle and merit the judgment should be affirmed, but, under the authority of the case of Weisner v. Ry. Co. (Tex. Com. App.) 207 S. W. 904,

which we are required to follow, the judgment must be reversed, and the cause remanded for another trial, for the error mentioned. From the Weisner Case, supra, it appears that rule 62a does not apply to an erroneous instruction where the case is submitted to the jury on a general charge. In that case the Court of Appeals held that a charge given was erroneous, but was entirely irrelevant to any issue that was raised by either the pleading or the evidence, and consequently a harmless error not injuring the rights of the appellant and not authorizing the reversal of the judgment under rule 62a. The Commission of Appeals reversed that ruling of the Court of Appeals solely upon the ground that the giving of an erroneous charge—

"is calculated to prejudice the plaintiffs and cause the jury to render an improper verdict. It is never possible in such case for any appellate court, where the case is submitted under a general charge, to say upon what ground the jury acted."

The Supreme Court not only approved the judgment in the particular case recommended by the Commission of Appeals, but further decided:

"The case is correctly remanded upon the ground stated by the Commission in its opinion."

Therefore the ruling has approval of the Supreme Court. The opinion can be construed in one way only, which is that of holding that the giving of an erroneous instruction, even though it relates to no issue raised either by the pleading or the evidence, "is calculated to prejudice (the plaintiff) and cause the jury to render an improper verdict." Then, under that holding, the giving of an erroneous charge in any case where the case is submitted to the jury on a general charge requires reversal on the ground that such error is conclusively "presumed," as a matter of law, to reasonably and probably cause the rendition by the jury of an improper verdict, and rule 62a would not operate to prevent a reversal. Upon that case as the authority for so doing, we are now reversing and remanding this case upon the appellants' application for rehearing.

## On Appellee's Motion for Rehearing.

After a full consideration again, it is believed that the ruling in the Weisner Case, supra, may not have been intended to reach to the extent and be applied as this court has construed it in appellants' motion for rehearing. It is not thought that it was reasonably meant to hold that, three separate issues being submitted to a jury under a general charge, two of them being proper issues to be submitted, and one issue being erroneously submitted, the case would have to be reversed, because it would not be possible for a court to say upon which ground the jury acted. The court doubtless meant to confine the ruling to that case, and not to apply it to a case like the one now being considered. To reach the conclusion that the error in the instant case "amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment," according to rule 62a, we are forced to find that, although three different issues were submitted, the jury's verdict was based upon the fact that the angle cock was the proximate cause of the injury, and that the jury did not find for the plaintiff on any other issue. If the jury found for the plaintiff on any two issues, the fact that a further but erroneous issue was submitted would not amount to a denial of the appellants' rights or cause the rendition of an improper judgment, for the plaintiff would still be entitled to recover on the ones properly submitted and having evidence to support them. There are two grounds here on which the plaintiff was entitled to recover, there being evidence to support them, that were properly submitted; and as to these two grounds the appellants' rights and defenses were in no wise restricted or affected by the third ground or charge in respect to it. Is it to be concluded that the jury found against the plaintiff on the two issues legally submitted, and in his favor on the one issue on which he could not legally recover? The three issues are distinct. It is believed that rule 62a has application. Our former opinion reversing the judgment is therefore set aside, and the judgment is, as in the original opinion, affirmed.

Chief Justice WILLSON is inclined to the opinion that it should not be said that in no view the jury might have taken of the testimony, could the negligent condition of the angle cock have been the proximate cause of the injury. It was a jury question.

The appellee's motion for rehearing is granted, and the judgment is, as originally ordered, affirmed.